Good morning. Whenever you're ready, counsel. Good morning. May it please the court. Andrew Love for the appellant Gerald Friedman. There's no dispute that AARP could not legally transact insurance without an insurance license, and that transacting insurance includes solicitation. What is in dispute here is whether plaintiff alleged sufficient facts or at least should have been able to be given the opportunity to allege facts in a first amended complaint to plausibly allege that AARP was engaged in solicitation. If I could call the court's attention to Excerpt of Record 276. That's the AARP website. The print in the excerpt is small, so for the court's convenience, I've made slightly enlarged copies. Oh, wonderful. You want to hand it to the clerk there? Oh, thank goodness. It's very small. And very hard to read. Yeah. Even with bifocals. Thank you. Thank you. Counsel, am I looking at the same thing? I had 268, but this is 276. I don't see a number on it. This is 276? 276. I certainly hope so. Okay. Go ahead. So AARP claims that all they were doing, that they were not soliciting their members to enroll in this insurance plan, but that they were merely informing their members of the existence of the plan. This is their website, which states towards the bottom, this is a solicitation of insurance. And it doesn't merely inform the members of the plan. Under where it says view plans and pricing, it informs its members what's important about getting a Medicare supplement plan generally. Mr. Love, is that language required in the regulations in order to alert consumers that basically this involves insurance? Yes. It's required when the purpose of the method of marketing is solicitation. So when it's marketing materials that it's soliciting, they have to say it's solicitation. And so their argument that you couldn't actually apply through the website, in your view, is irrelevant because solicitation alone is enough. That's right. Even though they had to go to a different website in order to actually complete an application and try to get insurance. Exactly. Transacting insurance is enough and solicitation is one aspect of solicitation. When I read Time magazine or Newsweek magazine and there's an ad that sort of looks newsy, you know what I mean? And then it says there's a little fine print that tells me that it's actually a paid advertisement. So when I see that, I don't think that Time magazine is advertising for the new medication that may have come out. I recognize that it's actually the drug company that's placed an ad. So I have always taken that ad to be aimed at preventing consumer confusion. It's not a news report. It's an advertisement. Why is this different? What's going on here is AARP is encouraging its members to purchase insurance. Under insurance law, you can't do that without a license. Okay. So if you could look at ER 278, which it's just two pages back from the one you handed up. And, of course, you'll know this backwards and forwards. But it says important disclosures. The AARP Medicare Supplement Insurance Plans carry the AARP name and UnitedHealthcare pays royalty fee to AARP for the use of the AARP intellectual property. Amounts paid are used for the general purposes of AARP and its members. Neither AARP nor its affiliate is the insurer. Why doesn't that do essentially what I'm talking about, which is inform the consumer who's really the insurer? Right. Two things about that. The first one is that in itself is misleading because it says UnitedHealth pays royalty fees to AARP when, in fact, it's the members that are paying the fee and it's not for just the royalty for intellectual property. Right. So that's a different argument. That is a different argument. Okay. But what about the point I'm making here about the disclosure not being a solicitation but being a disclosure to avoid consumer confusion? I don't think the issue is whether or not it's AARP's insurance or not. I don't think that's the concern in terms of why this is there. Right. But what I'm getting at is I think you think they're soliciting and your brief stresses that this says on the website this is a solicitation. Right. But just like opening up the magazine that has something that looks newsy and it tells me it's an advertisement, not a news report, why isn't this the same thing, the California statute requiring the consumers to be given notice that it is a solicitation? In other words, I'm distinguishing whether AARP is doing the soliciting as opposed to just notifying folks that there is a solicitation going on, not a factual report. Well, I think they're notifying that a solicitation is going on. These are AARP solicitation materials. It's their materials, their control over the materials. And it's not just the language that says this is a solicitation. If you read through this website and other materials, they are encouraging their members to purchase this insurance. And it's not just notifying them of the existence of the plan. And so when you put all these things together, we've alleged, plausibly alleged, that there's solicitation going on. So is it your position that any endorsement by AARP or any other group entity constitutes the business of transacting insurance? I think it's a fact question. I wouldn't say if all they said was this is an endorsement with their logo, I'm not sure that is enough. Well, clearly AARP is endorsing this particular Medigap coverage for the benefit of its members. But my question is, is that enough to constitute transacting insurance? I'm not sure if that's enough. I think that what also... I'm not sure if just endorsing is enough. And I take it you wouldn't quarrel with the right of AARP or any other entity that owns the right to the mark to collect a royalty for the use of that mark in connection with such an endorsement? That's correct. And that's what AARP says that that was all they were doing. And our argument is that there's a lot more that they were doing. It's a fact question. This was an initial complaint. And if the judge found it was insufficient... Well, the judge found that the 4.95% was in fact a royalty payment. I don't know what the premiums are, so I don't know what... well, I guess we know it's 5% of the premium, right? So if it's $100, it would be $4.95. But your position, of course, is that that's not a permissible finding in connection with the Rule 12b motion, because no findings are permissible in that context, right? That's exactly right. So the district court found... And your position is that you've adequately... you've plausibly alleged that these were commissions, and AARP says, well, no, they're royalties. And your position is that that's something that you really can't resolve in the context of 12b-6, right? Exactly right. And the judge did that. The judge did that. The judge found it was a royalty, even though the Medigap Agreement says that AARP is getting paid for two things. For the use of its trademarks and for sponsorship. So a portion of the 4.95% would be okay, because that would be a royalty? We just don't know how much out of the 4.95. Is that what you're saying? Because where else is the money coming from? Right. The 4.95 is for the royalty, for use of the intellectual property, which is all that AARP tells its members, and for sponsorship, which is not defined by what we allege means soliciting. So it's something less than 4.95% that's at issue here. We just don't know. Well, what we do know is that AARP established a for-profit agency that is supposed to monitor the trademarks, and that gets, I think, 8% of the 4.95. But isn't that as a result of some settlement they entered into with the Internal Revenue Service? That's exactly right. So we don't know exactly what portion goes to sponsorship. But how is that relevant to answering the issue that is before us? Just trying to surmise what portion goes to the trademark and trademark monitoring part, as opposed to the sponsorship. Well, let me ask the question in a different way. You don't allege anywhere in your complaint that there's any other source of money to pay the royalty, do you? No. So it's got to come out of that 4.95%, whatever it is. Yes. The royalty comes out of the 4.95%, as does the sponsorship and all the solicitation activities that AARP does. What do we make of the statement, the quotation on ER 29 from AARP's CEO at the Congressional hearing? Quote, number one, the royalties have nothing to do with the premiums of the beneficiaries, nothing to do with the premiums, and quote, none of the money is taken out of the premiums. I don't understand how to reconcile that. Okay. So what a member pays is a member contribution. The large part of that is the premium, which binds the insurance, and then there's a 4.9% above that, which just goes to AARP for sponsorship and royalty payments. Is that uncontested? Yes. Okay. That's in the Medigap Agreement. You say above it. I'm sorry. Go ahead. I think you're going to the same question. Yeah, I am. You say above it, but if the member pays $100, $4.95 goes to AARP. Isn't that what you're alleging? Yes, but that's not. So it's not. It isn't above it. The member contribution is $100 if you want Medigap coverage. Right, and the gross premium is the membership contribution minus the 4.95%. So if I am the person who's looking at this AARP website and I do the shopping, I put in my zip code and do the shopping of the comparison plans, and it's going to tell me how much my premium is going to be, right? It's going to tell you the member contribution. It's going to tell you the total amount you're going to pay. Okay, so when you say member contributions, some of the lingo is not particularly helpful to us because we can't tell if it's interchangeable. But if I go through this website and it tells me I'm going to pay $100, to use Judge Solomon's example, how much of that is premium and how much of that – and doesn't the 4.95% come out of that? Yes. So how do I reconcile that, counsel, with this statement from the congressional record? Because the 4.95% is not an amount that is needed to bind the insurance. It's an additional amount that members pay that goes to AARP. Okay, but if I'm the consumer, I'm going to get a statement each month that tells me to pay $100, right? Yes. And so I may very well think that that's my premium from the consumer's end. That's exactly right. And I think if I'm understanding correctly, your whole theory is that your client wouldn't have purchased this had he recognized that almost $5 was going to AARP. He viewed it as a premium in the layperson's sense. Yes. Would there have been anything wrong if the arrangement had been that the $100 was paid to UnitedHealth and then it paid $4.95 to AARP and said that's our payment for the royalty for the use of your mark and your endorsement? I think the problem is that it's – I'm not sure I understand. Well, as I understand it, the member pays the money to AARP. They deduct the $4.95 and then they remit the balance to UnitedHealth. Yes. Had it been set up so that United received the money directly with the application for insurance and then United remitted the $4.95 to AARP, would there be anything wrong with that arrangement in your view? I think it's the same problem because the member is still paying the 4.95% not knowing that what they're paying is – Why does the member in this hypothetical have – once the member pays the $100, what interest does the member have in how UnitedHealth disperses the money? Pays its landlord? Pays its lawyers? Because what the member doesn't know is that the 4.95 – that there's a premium amount that other plans have. It's alleged that the other plans charge less because they don't have this extra 4.95% fee on top of the amount that's needed to buy insurance. Doesn't it only matter if this hypothetical consumer could have purchased the plan for $95 somewhere else? Yes. Okay. And it's alleged that he can. Okay. So that's my other question because one would think with a group plan that he's getting a better rate, so to speak, but you think you've got the allegation here again at the 12B6 level that he could have purchased a comparable plan for $95 and he didn't know that. Is that right? Yes, that is right. Okay. And can you give me that citation to that paragraph of the complaint? Yes. It's, I believe, paragraph 16 and paragraph 17 where other plans charge less without such a fee. All right. And that it's reasonable to infer that if a plaintiff was told that in addition to what the premium needed to buy insurance, that he was paying this additional 4.95% that just goes to AARP for their sponsorship and, I guess, royalty as well, he wouldn't have paid it. You just said reasonable to infer. Does he allege that he relied on this and wouldn't have purchased it otherwise? Yes. In 16, 17? And that's 19 and 80. But for such conduct, they would not have paid the commission. 19 and where? 80. 80. Okay. You are out of time. Let's hear from the other side. Thank you. Thank you, Your Honor. Brian Boyle. I please the Court on behalf of the defendants. We think the district court correctly dismissed the complaint here because the plaintiff did not plausibly allege acts that rendered AARP or any AARP entity an agent. And that is actually the critical inquiry into whether it's possible to characterize the royalty as a commission. Only if there are plausible allegations of agency can the royalty be. But how do you square the website declaration that this is a solicitation with the statutory definition of transacting insurance? Well, that's a function of prophylactic regulations in California that say, flatly, if there's any cold lead advertising of any kind, you have to include this disclaimer. But that doesn't answer my question. Unless solicitation in the website page means something different from solicitation in the statute, is that your argument? Well, it goes back to the material legal issue, which is whether there are two flavors of agency under California law. One is actual appointment of an agent, an actual authorized agent. And there's no allegation here that AARP was anything of the sort. Then there's ostensible agency, which is where UnitedHealth might do things that would suggest to a reasonable person that the party they're dealing with is an agent of the insurer. Did you misspeak? Did you mean AARP? Yes. You said UnitedHealth. I'm sorry. Is there anything that UnitedHealth did that would cause a reasonable person to believe, looking at the advertisement, that AARP was an ostensible agent of UnitedHealth? And what I would suggest, Your Honor, is that when you look at the entirety of the webpage, the entirety of the webpage, not just the statement that says this is a solicitation, but also the language in the very same disclosure that AARP and its affiliates are not insurers, that AARP and its affiliates do not employ insurance agents, that you need to talk to a licensed agent in order to be insured under the program, that looking at that communication in its entirety would not cause a reasonable person to believe that AARP is functioning as a United agent. But what about the statements on ER 276 that was just handed up today, Counsel, where it says, why get an AARP Medicare supplement plan, and there's three bullets telling me why I ought to get this, what you need to know about it, and it tells me it may help me pay my, reduce my out-of-pocket expenses and whatnot. It doesn't appear, it doesn't feel like those are neutral statements. Well, AARP has endorsed the program, for sure, and it's making it available, making the program available to its members as associations are entitled to. Right, but he wants, the opposing counsel says this is a solicitation. It's not just informing me, you know, in the way I'm concerned about this sort of newsy report. It's encouraging me, isn't it? Solicitation of an application is, if you look at the cases he cites, involves more than just general information about the program. Right. Obviously, our contention is that an association can inform its members generally of the available programs. Where do we draw the line there, Counsel, between informing and, you know, nudging, encouraging? I think where the law draws the line is between providing views into pricing and underwriting for a particular insurance package, filling out an application. That's classic solicitation, and there's no allegation that you can do that on this AARP site. There's a reference in the plaintiff's brief to an 800 number that can be, and the 800 number on this webpage. The program agreement that's attached to the complaint explains what is behind that. The program agreement makes clear that there's a member services vendor, that the agreement indicates that the vendor is Hartford Fire, that is supposed to man the call center and provide those services for members. And so what makes this case a little bit deceptive, if you will, is that United has licensed all of AARP's marks for the program and is now offering branded coverage, and the mere fact that AARP's marks appear on advertisements, the mere fact that there's an 800 number listed on an AARP webpage doesn't mean that AARP is on the other end of the line. I mean, the program agreement that plaintiffs rely on makes very clear that that call center is to be operated by a licensed insurer, Hartford Fire, in the case of the agreement attached to the complaint. But the website doesn't have a different plan offered by anybody else, does it? That's true. AARP endorses only a single program of Medicare supplemental insurance. Don't the trust documents require AARP to solicit? Well, there is a 1958 trust agreement between AARP Trust and AARP that does say, as between those two organizations, it will be AARP that will do solicitation, if any of them does. But UnitedHealth is not a party to that agreement. That predates by 30 years our involvement in this program. I mean, has it been amended or changed? Is it still the operative trust document? I truly don't know. It's outside the pleadings, Your Honor. But I do know that UnitedHealth is not alleged to be a party to that agreement. The program agreement that's attached to the complaint allocates responsibility to us between United and AARP in the following ways, that United is the insurer, United shall employ agents, that neither United nor AARP are agents of the other. And as I mentioned earlier, in Section 9.2.1 of the program agreement, you will see reference to the member services vendor that's supposed to run the call center and provide information to the program. So, sure, there's sponsorship here, there's endorsement, but there are no plausible allegations that AARP has been involved in procuring applications for coverage. But don't you advertise for this program in addition to on the website, on television, for example, and through other sources? And, you know, Your Honor, what I would say is... Was that a yes? I missed it. Yes. Thank you. There are advertisements on television, and those advertisements are pursuant to the program agreement under which United has licensed AARP's marks. And the ads I'm familiar with are UnitedHealth advertisements, where United is using AARP's marks as they are entitled to do under the program agreement. That doesn't mean that AARP is engaged in insurance solicitation. The key question is who's using the marks to solicit applications for coverage. It is UnitedHealth and its agents. It's not AARP. Can I change gears a little bit? Yes, Your Honor. I want to make sure. I think Medigap is health insurance, right? It's not insurance against the possibility of being uninsured. It qualifies as health insurance under California law, doesn't it? Your Honor, that's right, but I think it comes in under life and disability. Right. Hence my question. So we're getting there. I think it does, but feel free to correct me if I'm wrong. Under 1621, AARP isn't an insurance agent, right? AARP is under no circumstances an insurance agent. So what about 1622? 1622, I think, is that the statute that deals with life and disability? Right. They're not an insurance agent under any of those provisions. I'm not sure why AARP isn't an insurance under 1622. I understand why it's not under 1621. But I'll just – if you don't have an answer for me, I don't want to use up all your time, but that's something that's troubling me. I don't see anything in 1622 that defines agency in any particular that would sweep in AARP. Your Honor. Let me – I want to clarify something about the member contribution. I think this could be straightened out relatively easily. The program agreement says that the fees that United is to submit to insurance regulators and get approval of, because there's comprehensive rate regulation in California, are the member contributions. So in my hypo, it's the $100? It's the $100. Okay. Member contributions are premium in the statutory sense. California reviews those for reasonableness. United cannot pay any less than 75% of that sum in support of claims. There can be as much as 25% for administrative fees, including whatever royalties they're paying, including profit. The agreement, though, does use other terminology, net premiums, gross premiums, for internal accounting purposes under the arrangement. But when Your Honor thinks of premiums in the statutory sense, what's being approved by regulators, it's the member contribution rate. And one of the points that we feel makes the idea of the possibility of an amendment futile here is that there is no way United could charge anything different for the coverage than the member contribution rate approved by federal regulators. And so there's no economic injury here in the Prop 64 sense for the UCL claim. Though AARP could approach United and say, we want an increase in the 4.95%. And that would come out of the approved statutory premium, the member contribution rate. And United might go back to the insurance commissioner and say, now I want approval for $105. But the point is, whatever that interplay, the rate that must be collected from members is the approved member contribution rate. And out of that, United is restricted to paying 25% of that sum for administrative costs, whatever you want to characterize the AARP amount here. And as a result, while the complaint declares that the plaintiff and other insurers have paid artificially inflated premiums, that really has no currency under California law. There can't be economic injury here in the sense that there's no other rate that United could collect. And there are a couple of cases we've cited in the briefs, Medina and Selco Partnership, for that point. For this precise point, in fact, that when you deal with an unlicensed insurance agent, you happen to have purchased coverage at a regulated rate from an unlicensed insurance agent, there's no economic injury because you'd pay the same regulator-approved rate otherwise. So is your answer to the last point that Mr. Love made, that his client would have gone to an alternate insurance plan had he known about the 4.95%? The answer is he was free at all times to surf the Internet and find competing insurance plans and decide whether, for whatever they were charging, he was getting an equivalent amount of cover. If it was about the total cost of coverage, that was well within his capability. So the answer is yes? The answer is yes, I'm sorry, Your Honor. That's all right. The complaint fuzzies it up a little bit. It talks about, in paragraph 3, about the plaintiffs and the afforded class paying artificially inflated premiums. They wouldn't have paid the 4.95% if they'd known about it. And then in paragraph 22, the plaintiff returns to that theme. And I think the reason the complaint pleads the injury that way, that they wouldn't have paid the 4.95%, which I don't think could be cognizable under California law, because if it was a fraud-in-the-inducement theory that I wouldn't have participated in this program at all if I'd known about the 4.95%, that fraud-in-the-inducement-type theory would be very difficult to certify on a class basis, almost impossible. And so I think the complaint was designed intentionally to say, we've paid artificially inflated premiums, give us back the 4.95%, which is not an economic injury that could be cognizable under the UCL after Prop 64, and in any event would be a very difficult claim to certify on a class basis. I want to make another point, which I guess is obvious. We're talking about the website, some of the websites. We've talked about the 800 phone number that's on the website. The plaintiff says nothing about how he got his coverage, and that was a very easy thing for him to plead. You mean his personal reliance? Yeah. Did he deal just independently with United? Did he deal with the United license agent? But that's correctable by amendment, right? It is, except Judge Pregerson below says, you know, he said point blank to blank, what else do you want to know, what else do you want to put out here? And there was nothing else that was volunteered at that point. There's nothing else that's been volunteered on appeal as to how they would amend. And so I think while the websites are not a difficult point for us, it is important to note the plaintiff doesn't allege how he got his coverage. I think that's critical. I think the counsel mentioned the idea that sponsorship, payment for sponsorship, is somehow problematic under California law, and the same intimation is in the brief. I just don't understand the point. There's nothing in California law that says you can't offer an endorsement, sponsor a program of insurance in exchange for compensation. The line that you can't cross is you can't solicit applications for coverage. And, of course, there's no allegation, plausible allegation, that plaintiff's application for coverage was solicited by AARP. And so I would close by suggesting that the critical question, again, is are there plausible, concrete allegations that AARP engaged in the conduct of solicitation, transacted an insurance by inviting his application into United, and there are no such allegations, and therefore it's impossible to characterize the royalty as anything but a royalty. Thank you. Mr. Love, I'll give you a couple of minutes to rebut. Thank you. So the trust agreement that Judge Parker referred to, it's not in the complaint. It was discovered after the filing of the complaint, but that's between AARP and AARP's trust in which AARP is required, if asked by the trust, to solicit members. Okay, but you don't dispute counsel's representation that UnitedHealth is not a party to that contract? That's correct. What it does is help explain, I think, AARP's subsequent behavior in terms of soliciting. Do you agree that AARP is not an insurance agent under 1621? I don't think it is. Okay, thank you. And then with regard to the phone call, which it's also not in the complaint, the phone number's in the complaint and the reply brief. I called the number, and so I put in what I heard. I understand that, but that wasn't before the district court, right? That's correct. So again, that's something that could be . . . So move on to your next point. If I may, that could be amended in, given the opportunity. But you didn't offer that suggested amendment to the district court when he solicited. What more would you plead if I allowed you to amend, did you? They're an oral argument. So how could the district court be said to have abused its discretion in finding that amendment would be futile if you offered nothing in response to his question? I think at this stage when the court denies the amendment on the ground of futility, this court can grant leave to amend if this court could conceive of any facts that would support the claim. U.S. versus Corinthian Colleges, I believe. Okay. And with regard to the Department of Insurance has already approved this amount, the 4.95%, but if that 4.95% is an illegal commission, as we allege, or illegal compensation for our services, then we've stated a claim that it's an improper amount, even if it's within the 25%. And had . . . Well, is it? I mean, I've been wrestling with this from the beginning of the case. If it's perfectly permissible for one entity to pay another entity a royalty for the use of its mark, and if, as you conceded the last time you were up, that payment for that royalty comes out of the 4.95%, then we're really only talking about a portion of the 4.95%, right? Right. We don't know what portion. I mean, your client might not have wanted to pay $4.95 more, but it's a legitimate business transaction between the two entities to compensate AARP for the use of its mark. So his only choice really would be to go find a competing insurance plan at a lower premium if he doesn't want to pay the 4.95%. I think this is where the district court also found that it was all, or most of the 4.9%, I think the court found all of it was for licensing for the trademark. But there are all these activities that AARP did, which we allege acted essentially as an insurance agent soliciting insurance. Such as? Such as? List them for us. Okay. Such as owning the solicitation materials, oversight of all the solicitation materials. They all had to be approved by AARP before they could be used. By actually soliciting, as they did on this website and TV ads on the internet. They also... Well, why is directing a potential consumer to UnitedHealth soliciting? Soliciting, you know, it's not defined in the code, but it's enticing, or the common thing is enticing and encouraging its members to enroll in this particular insurance. Suppose that it said, if you want auto insurance, go to Nationwide or State Farm. Would that be soliciting insurance? I think, you know, I think it's a fact question. It depends how much you say. That's all I say. If you want auto insurance, go to Nationwide or State Farm. I think that could be considered soliciting, particularly if you're getting paid a good chunk of money for doing so. And that you're essentially in the insurance business, and then you need to be under the insurance code. Here, in addition to the ones that I've laid out, there are others that plaintiffs should be allowed to amend the complaint at least one time. To develop additional facts for solicitation. There are others that are not on the record, so I can't speak of them. So, except for the 1-800 number, what are those additional facts that you would allege in your amended complaint? More details from the television ads and internet ads. There's something called an authorized to offer program, in which all UnitedHealth agents need to be authorized by AERP. So it's not as if they're these separate agents of UnitedHealth. AERP is very much involved in the insurance business, and in transacting insurance. Did you give me your complete list of the conduct you contend is solicitation? I think, yes, I did. Thank you. Counsel, thank you. Your time has expired. The case just argued is submitted for decision. We will now hear argument in United States XREL Darren Kelly v. Serco, Inc., No. 14-56769.
judges: Parker, Tallman, Christen